[No. A080747. First Dist., Div. Three. Feb. 3, 1999.]

DOROTHY CHAKNOVA et al., Plaintiffs and Appellants, v.
WILBUR-ELLIS COMPANY, Defendant and Respondent.

**COUNSEL**

Brayton Harley Curtis, Brayton, Purcell, Curtis & Geagan, Philip A Harley, James L. Oberman, Diane L. Abraham, Gilbert L. Purcell, James Geagan and Marc L. TerBeek for Plaintiffs and Appellants.

Thacher, Albrecht & Ratcliff, James F. Thacher, Charles S. Holden; Becherer, Kannett & Schweitzer and Mark S. Kannett for Defendant and Respondent.

## OPINION

**WALKER, J.**—Dorothy Chaknova, on her own behalf and as successor in interest to her deceased husband, Albert Chaknova,[1] appeals the trial court's entry of summary judgment in favor of respondent corporation, Wilbur-Ellis Company (Wilbur-Ellis) in this action for asbestos-related injuries. We hold, as did the trial court, that Wilbur-Ellis met its burden of establishing that it is not liable for appellants' injuries. The Chaknovas failed to create triable issues of material fact concerning Wilbur-Ellis's liability as successor in interest to the asbestos brokerage firm L. H. Butcher, and concerning Albert Chaknova's exposure to asbestos brokered by Wilbur-Ellis.

### Procedural History

Albert and Dorothy Chaknova filed complaints for personal injury and loss of consortium, respectively, against several asbestos defendants including respondent Wilbur-Ellis. The actions were consolidated and Wilbur-Ellis moved for summary judgment on the grounds that it had no liability as a corporate successor nor as a "product line" successor to L. H. Butcher,[2] a corporation alleged to have brokered asbestos to which Albert was exposed during his career as a pipefitter. Wilbur-Ellis also sought summary judgment on the ground that the Chaknovas lacked admissible evidence that Albert was exposed to asbestos sold either by L. H. Butcher or by a Wilbur-Ellis subsidiary.[3] The trial court granted summary judgment on each of these grounds.

### Facts

Albert Chaknova alleged in his complaint that he developed asbestosis as a result of exposure to asbestos and asbestos-containing products during his employment as a pipefitter from 1943 through 1979. In an amendment to his complaint he substituted "WILBUR-ELLIS COMPANY, individually and as parent, alter-ego, and successor-in-interest to L. H. Butcher Co." in place of DOE 11. On summary judgment the following undisputed facts were established: On November 30, 1960, Wilbur-Ellis purchased the asbestos distribution and industrial chemical business assets of L. H. Butcher Company, a wholly owned subsidiary of Udylite Corporation of Delaware. L. H. Butcher

---

[1] Albert Chaknova died after entry of judgment.

[2] L. H. Butcher was a wholly owned corporate subsidiary of Udylite of Delaware, which survived the sale of its assets to Wilbur-Ellis.

[3] The parties refer to L. H. Butcher before the sale of its assets to Wilbur-Ellis as "Butcher I" and to L. H. Butcher after the sale to Wilbur-Ellis as "Butcher II." For clarity, we always refer to the predecessor entity as "L. H. Butcher" and to the successor entity as "Wilbur-Ellis," although we are aware that Wilbur-Ellis purchased and used the name L. H. Butcher.

Company was a distributor of industrial chemical supplies including asbestos. As consideration for the sale, Wilbur-Ellis agreed to pay $3.7 million, by paying $2.5 million in cash at closing and $1.2 million in 10 equal annual installments.[4] It was agreed that this purchase price would be calculated as "(i) an amount equal to the total net book value of Butcher at the Closing Date, determined in accordance with generally accepted accounting principles consistent with those customarily employed by Butcher, as set forth in a balance sheet . . . prepared by Butcher and audited by the Accountants in accordance with generally accepted auditing standards . . . and (ii) *the assumption of all the liabilities of Butcher given effect in the determination of said net book value . . . .*" (Italics added.) The audited balance sheet included no amounts for tort liabilities, contingent or otherwise.[5]

As part of the agreement, L. H. Butcher agreed to change its name so that Wilbur-Ellis could use the "L. H. Butcher" name in connection with the asbestos distribution business. Accordingly, in December 1960 the original L. H. Butcher became Udylite of California, Inc., which corporation became Udylite of Delaware's wholly owned subsidiary. In 1962, 15 months after the asset purchase, Udylite of California was dissolved pursuant to an "Agreement and Plan of Liquidation" entered into between Udylite of California and its sole shareholder, Udylite of Delaware. Wilbur-Ellis played no part in the decision to dissolve Udylite of California, nor could it have, as it had no board members in common with Udylite of Delaware or Udylite of California, owned no stock in either corporation and exercised no control over either entity. Furthermore, there was no provision in the original asset purchase agreement between Wilbur-Ellis and L. H. Butcher requiring the dissolution of the selling corporation.

On November 30, 1960, the same day Wilbur-Ellis purchased L. H. Butcher's asbestos and chemical distribution business, Wilbur-Ellis assigned and transferred its right title and interest under the purchase agreement to its

---

[4] In addition to obtaining the purchase price of $3.7 million for its asbestos and chemical business assets, L. H. Butcher retained for itself two Mexican subsidiaries, "cash on hand (except petty cash on hand) and in banks"; "[a]ccounts, notes, or other credits charged off upon the books of Butcher prior to the Closing Date, and any other claims of whatever nature which are not given effect in the determination of the Purchase Price for the Assets." It also retained its minute books, stock books and other corporate records, its general ledgers and subsidiary ledgers, its federal and state tax returns and its files and records pertaining to account audits.

[5] The balance sheet enumerated, and Wilbur-Ellis assumed, only the following liabilities: (1) 4½ percent demand notes payable to the Udylite Corporation—$350,000; (2) accounts payable—$1,775,240; (3) mortgage installment due within one year—$52,000; (4) accrued payroll and other compensation—$155,353; (5) accrued expenses and miscellaneous accounts payable—$117,883; (6) estimated income tax—$136,917; (7) monthly mortgage installments of $4,333 to December 15, 1965—$260,000.

wholly owned subsidiary, Wilbel, Inc. Three years later, on December 31, 1963, Wilbel, doing business as L. H. Butcher, was merged into Wilbur-Ellis. By virtue of the merger Wilbur-Ellis assumed all of Wilbel's existing obligations.

In February 1964, 39 months after acquiring L. H. Butcher, Wilbur-Ellis got out of the asbestos business when it sold the goodwill and assets of its asbestos distribution business to Central Solvents & Chemicals Company, an unrelated entity.

### *Standard of Review*

We review de novo the granting of a summary judgment motion to determine whether there exists a triable issue of material fact, or whether, there being none, the moving party is entitled to judgment as a matter of law. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1514 [285 Cal.Rptr. 385].)

### DISCUSSION

### A. *Wilbur-Ellis Did Not Assume L. H. Butcher's Tort Liabilities*

As a general rule, "where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts. [Citations.]" (*Ortiz* v. *South Bend Lathe* (1975) 46 Cal.App.3d 842, 846 [120 Cal.Rptr. 556], disapproved on other grounds in *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 34 [136 Cal.Rptr. 574, 560 P.2d 3] (*Ray* v. *Alad*).)

Appellants assert the first of these conditions applies here to impose liability on Wilbur-Ellis; namely that it expressly or impliedly assumed contingent liability for asbestos-related injuries that might be incurred at some time in the future arising out of L. H. Butcher's brokering activities prior to 1960. We look first to the language of the agreement itself, which we conclude unambiguously shows no assumption by Wilbur-Ellis of existing or contingent tort liabilities.

Under the terms of the agreement, the $3.7 million amount set for the purchase price took into account Wilbur-Ellis's *"assumption of all the liabilities of Butcher given effect in the determination of said net book value . . . ."*

(Italics added.) Those liabilities, as detailed in footnote 5, *ante*, did not include the sort of contingent liability for injuries incurred in the future for which appellants seek to hold Wilbur-Ellis liable. As further indication of the limited nature of Wilbur-Ellis's liability assumption, the agreement provided that it would assume obligations to be performed under existing leases, purchase orders and executory contracts and assume liabilities related to those contracts.[6] These provisions are clear and unambiguous: they pertain to the assumption of ongoing business dealings and the performance of those contracts, and not to contingent tort liability.

Appellants claim, however, that the agreement can be interpreted so as to include Wilbur-Ellis's assumption of liability for L. H. Butcher's tortious acts. In support of this claim, appellants point to a letter written by Wilbur-Ellis's attorney on November 26, 1960, to the state Deputy Commissioner of Corporations concerning Wilbur-Ellis's application for permission to issue stock. The letter discusses Wilbur-Ellis's purchase of L. H. Butcher including its "assumption of the balance of Butcher's liabilities." According to appellants, this phrase created a triable issue of material fact regarding Wilbur-Ellis's intention to assume *all* of L. H. Butcher's liabilities, notwithstanding what the sales contract documents provide. We reject this claim for two reasons.

First, in responding to Wilbur-Ellis's summary judgment motion, appellants admitted that Wilbur-Ellis purchased L. H. Butcher's assets "under an integrated set of contract documents dated November 30, 1960" which did not include the November 26 letter. Matters extrinsic to an integrated contract will not be considered to modify the unambiguous language of those contracts. (Code Civ. Proc., § 1856,[7] subd. (a); *Heller* v. *Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1382, fn. 4 [58 Cal.Rptr.2d 336]; see also *Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561].) As we have said, the documents comprising the agreement between Wilbur-Ellis and L. H. Butcher are clear with respect to the assumption of liabilities: Wilbur-Ellis assumed "all the liabilities of Butcher *given effect in the determination of said net book value* . . . ." (Italics added.) Thus, Wilbur-Ellis assumed very specific financial liabilities as given effect on L.

---

[6]As to purchase orders and executory contracts, the agreement provided as follows: "Wilbur will assume and agree to perform all of the obligations and undertakings on the part of Butcher to be performed under any purchase orders and service or utility or executory contracts pertaining in any manner to its business, and to indemnify and save Butcher harmless from any and all costs, expenses, liability, or obligation whatsoever by reason of Butcher's having been or being party thereto (except such as might arise by reason of the default of Butcher in the performance of its obligations thereunder occurring prior to closing)[.]" A similar provision addressed Wilbur-Ellis's assumption of lease obligations.

[7]All further statutory references are to the Code of Civil Procedure.

H. Butcher's balance sheet. (See fn. 5, *ante*.) Therefore, even if the letter to the corporations department suggested that Wilbur-Ellis was intending to assume other of L. H. Butcher's liabilities, the subsequently executed unambiguous integrated contract documents speak clearly for themselves and are not subject to modification by the earlier letter.

In any case, we also hold that the letter to the Commissioner of Corporations, even if it were to be considered, does not create a triable issue regarding the liabilities assumed by Wilbur-Ellis. Nothing in the letter suggests any variance from the provisions in the contract. The letter addresses, in general terms, the contract between the parties, and notes per the attached copy of L. H. Butcher's balance sheet, that it is buying L. H. Butcher for the approximate amount of its net worth, plus an amount approximately equal to the subsidiary's debt to its parent (Udylite of Delaware) and the "assumption of the balance of Butcher's liabilities" which are also reflected on the balance sheet. In light of the subject matter of the letter, it cannot be reasonably interpreted to mean that Wilbur-Ellis is assuming L. H. Butcher's tort liabilities.

B. *The Wilbur-Ellis/Wilbel Merger Did Not Result in an Assumption of L. H. Butcher's Tort Liabilities*

Appellants also claim that Wilbur-Ellis assumed L. H. Butcher's tort liabilities when, in 1963, it merged with Wilbel, its wholly owned subsidiary to which had been transferred the right, title and interest in L. H. Butcher's assets and business on November 30, 1960. As we have been discussing, nothing in the purchase agreement between Wilbur-Ellis and L. H. Butcher made Wilbur-Ellis liable for any of L. H. Butcher's pre-1960 tort liabilities. Therefore, Wilbel did not acquire those liabilities when it acquired L. H. Butcher's assets and was still not liable for them when it later merged with its parent in 1963. Under a corporate merger Wilbur-Ellis only assumed those liabilities belonging to Wilbel at the time of the merger. It assumed no tort liabilities for L. H. Butcher's conduct prior to the November 30, 1960, purchase by Wilbur-Ellis.

C. *Wilbur-Ellis Is Not L. H. Butcher's Product Line Successor*

Notwithstanding the above cited limitations upon the imposition of responsibility to a successor corporation for a predecessor corporation's liabilities, under certain limited circumstances an exception has been judicially created to provide a remedy against the successor to a person injured by the predecessor's product. This exception, first enunciated in *Ray* v. *Alad*, *supra*, 19 Cal.3d 22, has become known as the "product line successor" rule.

In *Ray* v. *Alad, supra,* 19 Cal.3d 22, the Supreme Court imposed liability on Alad Corporation for the plaintiff's injury sustained in a fall from a defective ladder manufactured by Alad Corporation's predecessor. The injury occurred more than six months after Alad Corporation had acquired the assets of the dissolved ladder manufacturer. Although none of the traditional bases for imposing liability on Alad Corporation were present in the plaintiff's action against it for strict tort liability, the court held that given the specific circumstances, the plaintiff should recover under a special exception to the general rule. The court explained that " 'the paramount policy to be promoted by the [strict product's liability] rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' [Citation.]" (*Id.* at p. 31, italics omitted.) It held that imposition of strict liability against the successor to the manufacturer was justified where, as in the case before it, the plaintiff had no viable remedy against the then nonexistent manufacturer of the defective product, the successor to the manufacturer continued to manufacture the same product line as its predecessor, retained the same personnel, used the same designs and customer lists, gave no outward indication of the change in ownership and had opportunities to evaluate production risks and pass on the cost of meeting those risks almost identical to its predecessor's. (*Ibid.*) The court presented a three-part rationale for imposing strict liability on the successor corporation: "(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." (*Ibid.*)

 We hold that the circumstances of the L. H. Butcher/Wilbur-Ellis transaction differ in significant respect from *Ray* v. *Alad* and do not satisfy the three criteria enunciated therein. We analyze each prong in light of the undisputed facts before us.

1) *Destruction of the Plaintiff's Remedies Against the Original Manufacturer Caused by the Successor's Acquisition of the Business*

The first factor the Supreme Court considered in deciding whether to stray from ordinary rules of corporate successor liability was whether the successor's acquisition of the original manufacturer's business caused the virtual destruction of the plaintiff's remedies against that manufacturer. In *Ray* v. *Alad*, the manufacturer/predecessor was dissolved within two months after Alad Corporation's purchase of its assets, trade name and goodwill "*in*

*accordance with the purchase agreement.*" (*Ray* v. *Alad, supra,* 19 Cal.3d at p. 31, italics added.) Thus, by virtue of the very terms of the agreement, that the predecessor would dissolve " '. . . as soon as practical, . . .' " the predecessor ceased to exist as a business entity and the plaintiff's remedies against it were thus destroyed. (*Id.* at p. 26.) Alad Corporation, in a very real sense, *caused* the destruction of the remedy by its acquisition of everything the predecessor possessed which made it an ongoing concern answerable for its liabilities.

Since *Ray* v. *Alad* was decided it has been rightly suggested that the case should not be construed so narrowly as to "permit[] a similar result only in an *Alad* clone." (*Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 900 [159 Cal.Rptr. 119] (*Rawlings*).) Following this proposition, the court in *Kaminski* v. *Western MacArthur Co.* (1985) 175 Cal.App.3d 445 [220 Cal.Rptr. 895] declined to impose a strict interpretation of *Ray* v. *Alad*'s causation requirement. It held that the first prong was satisfied where the successor corporation, while not expressly planning for the predecessor's demise, did exercise complete control over the predecessor and "could have at any time forced Western [the predecessor] into bankruptcy. It also had the right to essentially dictate policy to the original Western Directors, who were forced to implement all decisions including the decision to dissolve." (*Id.* at p. 458.) The court held that by obtaining financial and managerial control over the financially strapped predecessor, the successor was able to engineer a takeover which substantially contributed to Western's demise, thereby satisfying the first *Ray* v. *Alad* test.

The same cannot be said of Wilbur-Ellis's purchase of L. H. Butcher. The corporate entity which had been L. H. Butcher continued to exist as Udylite of California for 15 months, when it was dissolved and liquidated by its sole shareholder, Udylite of Delaware, a corporation with absolutely no affiliation to Wilbur-Ellis. The undisputed evidence showed that L. H. Butcher obtained $3.7 million as adequate consideration for its asbestos business assets, that it had this payment, in the form of a $2.5 million down payment and $1.2 million in periodic payments available to satisfy claims, that it continued as an ongoing corporate entity for 15 months after the sale, and that Wilbur-Ellis played no role in its decision to dissolve, as the 2 entities had no corporate overlap.[8] The legitimate considerations of fairness which were implicated by the circumstances presented in *Ray* v. *Alad* are not present here. To conclude that the first prong has been satisfied under the facts of this case would essentially eviscerate the general rule of successor nonliability by potentially exposing successors to liability in every case where the predecessor eventually and unilaterally dissolved after selling off

---

[8]The two corporations had different shareholders, officers and directors.

its assets. We do not believe our Supreme Court intended the exception enunciated in *Ray* v. *Alad* to be applied so broadly, and decline to do so here.

### 2) *Successor's Ability to Spread the Risk*

The second area of concern to the court in *Ray* v. *Alad* was whether the successor corporation had acquired from the predecessor those resources essential to its ability to meet its responsibility to people injured by product defects. There, Alad Corporation not only acquired its predecessor's physical plant, manufacturing equipment and inventories, but also "the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of [the predecessor's] general manager." (*Ray* v. *Alad, supra,* 19 Cal.3d at p. 33.) With these, the court concluded that the successor had essentially the same capacity as its predecessor to estimate the risks of claims against it for injuries caused by product defects and to make appropriate arrangements for insurance. (*Ibid.*)

The court in *Rawlings, supra,* 97 Cal.App.3d 890, reached a similar conclusion to impose liability against the successor to a manufacturer of custom-made kelp dryers. It held that the successor, which had purchased the predecessor's ongoing business including its name, goodwill, tools, machinery and equipment, was "in a position to protect itself from loss by expressly providing for that risk in the bargain it made with sellers. . . . [¶] As a practical matter, postsale [successor] is in the same position as its predecessor to spread the costs of injuries among its *current* customers." (*Rawlings, supra,* 97 Cal.App.3d at p. 901, italics added.) As had the court in *Ray* v. *Alad,* the *Rawlings* court rested its imposition of liability on "[f]undamental fairness . . . through a balancing of the rights of the injured party against the rights of those engaged in business, *including the latter's reasonable commercial expectations.*" (*Id.* at pp. 900-901.)

The Wilbur-Ellis/L. H. Butcher transaction certainly has many of the same characteristics as *Rawlings* and *Ray* v. *Alad.* Wilbur-Ellis purchased the L. H. Butcher name, physical plant facilities and machinery, and L. H. Butcher's employees became Wilbur-Ellis's employees.[9] The differences, however, are what we find to be crucial and dispositive. First, in *Ray* v. *Alad* and *Rawlings* the defendant successor corporation was still a going concern engaged in the same business as its predecessor *at the time* the action against it was

---

[9]No provision was made, and no premium was paid for the purchase of L. H. Butcher's "goodwill."

initiated.[10] In this case, Wilbur-Ellis sold L. H. Butcher to an unrelated entity, Central Solvents & Chemicals Company in 1964, fully 31 years before Albert Chaknova brought his action for injuries and 33 years before Dorothy Chaknova brought hers. Second, the specter of asbestos-related injuries did not appear for many years after Wilbur-Ellis sold its asbestos-related business. Thus, unlike the defendants in *Ray* v. *Alad* and *Rawlings* who could reasonably anticipate injuries to those using their products, Wilbur-Ellis had no way to calculate the health risks posed by asbestos and incorporate those risks into its pricing and insurance decisions.

### 3) *Fairness of Imposing Liability on Successor for Predecessor's Defective Product*

Finally, *Ray* v. *Alad* held that it was fair and equitable to impose liability on the successor for the predecessor's defective product "in view of [the successor's] acquisition of [the predecessor's] trade name, good will, and customer lists, its continuing to produce the same line of ladders, and its holding itself out to potential customers as the same enterprise." (*Ray* v. *Alad, supra,* 19 Cal.3d at p. 34.) It was fair, the court explained, to impose the burden on the one reaping the benefit, and to guard against a windfall to the predecessor that might result from an increased purchase price paid in the absence of successor liability and the predecessor's precipitous liquidation to avoid responsibility for subsequent injuries caused by its products. (*Ibid.*) Similar considerations influenced the court's imposition of successor liability in *Rawlings.*

We appreciate that the product liability rule is intended to protect the victims of manufacturing defects and to spread the cost of compensating those victims. Still, where a policy rests upon fundamental fairness, as does product line successor liability, the question of fairness must, itself, be applied with an even hand. Essentially, the undisputed evidence presented here does not dictate the imposition of successor product line liability on Wilbur-Ellis. Given the 35-year time lapse since Wilbur-Ellis was engaged in the asbestos business, the short 39-month time period it spent in the business, the impossibility at the time of envisioning the need to spread such an enormous but then unknown risk, the payment of adequate consideration for the business, and the fact that L. H. Butcher continued as a corporate

---

[10]In *Rawlings* there remained a factual dispute as to whether the successor currently manufactured the identical product line as that involved in plaintiff's injury. The court based its decision in part on the fact that the successor had continued in the same general business, whether it continued to make the specific injurious product or not. (*Rawlings, supra,* 97 Cal.App.3d at p. 901.)

entity with substantial assets until dissolving without Wilbur-Ellis's involvement,[11] we conclude that it would be unfair to impose successor product line liability on Wilbur-Ellis.

### D. Appellants Failed to Create a Triable Issue as to Albert Chaknova's Exposure to Asbestos Distributed by Respondent

Wilbur-Ellis does not deny that it could be held liable for injuries from exposure to asbestos it produced, brokered or distributed during the years 1960 to 1964 when it and its subsidiary Wilbel did business as L. H. Butcher. It contends, and the trial court found, that appellants presented no evidence to show such exposure. The trial court found that by relying upon the Chaknovas' "factually devoid discovery responses and deposition testimony" in support of its motion for summary judgment, Wilbur-Ellis had successfully shifted the burden of proof regarding asbestos exposure to the Chaknovas. It further held that the Chaknovas had "failed to raise a triable issue of fact through admissible evidence that Albert Chaknova was exposed to asbestos produced or distributed by [Wilbur-Ellis] between November 30, 1960 and March 2, 1964 . . . or that Mr. Chaknova was exposed to asbestos at any site at which he worked from 1960 to 1968." We agree.

On summary judgment, a defendant's burden may be met by showing that "one or more elements of the [plaintiff's] cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (§ 437c, subd. (o)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show that "a triable issue of one or more material facts exists as to that cause of action . . . ." (*Ibid.*) A plaintiff, in meeting the shifted burden, "shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action." (*Ibid.*) ▪ As explained in *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653], " 'a moving defendant may rely on factually devoid discovery responses to shift the burden of proof pursuant to section 437c, subdivision (o)(2). Once the burden shifts as a result of the factually devoid discovery responses, the plaintiff must set forth the specific facts which prove the existence of a triable issue of material fact.' " (*Id.* at p. 590;

---

[11]These last two factors distinguish this case from *Rosales* v. *Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187 [78 Cal.Rptr.2d 861]. There, the predecessor did not receive any money paid in consideration for its business. The payment went directly to a separate entity which was owed money by the predecessor. In fact, at the time of the purchase, the predecessor "had no assets to satisfy its obligations to anyone" and did not even have its own bank account. (*Id.* at p. 195.) The court held that by paying the purchase price to another entity, leaving the predecessor without assets, the successor virtually destroyed the plaintiff's remedies against the predecessor. (*Ibid.*) In this case, L. H. Butcher was left with the cash from the sale and continued to exist until its parent decided on dissolution.

accord, *Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1287 [44 Cal.Rptr.2d 335] (*Hunter*).) If plaintiff fails to make that showing, summary judgment "shall be granted." (§ 437c, subd. (c).)

In *Hunter*, summary judgment was granted in favor of defendant Pacific Mechanical Corp. (PMC), a contractor alleged to have "supplied, installed, and/or removed asbestos-containing products at the same jobsites" where the plaintiff was working, thereby exposing him to asbestos because of his close working proximity to PMC employees. PMC moved for summary judgment, relying primarily on the plaintiff's deposition testimony that he was unfamiliar with PMC and could not remember ever working in the same area with PMC employees. In opposing the motion, the plaintiff provided evidence to show that there was "an overlap in work sites during various time frames, suggesting that it was possible that he could have been present at the same jobsite as PMC employees." (*Hunter, supra,* 37 Cal.App.4th at pp. 1284-1285.) The trial court granted summary judgment because plaintiff's own deposition showed that he could not establish an evidentiary basis for PMC's liability and plaintiff submitted no other facts to rebut that showing.

On appeal, following the *Union Bank* analysis, the court affirmed, explaining that "PMC was not required to come forward with evidence of its own to affirmatively demonstrate that Hunter could not have been exposed to asbestos as a result of PMC's activities. Rather, it was enough to show through factually vague discovery responses that [plaintiff] lacked any significant probative evidence on the critical element of causation. In other words, PMC could effectively show that the element of causation 'cannot be established' by pointing to an *absence of evidence* to support this element. (§ 437c, subd. (o)(2).)" (*Hunter, supra,* 37 Cal.App.4th at p. 1288, italics in original.) Upon this showing, the burden shifted to the plaintiff to show the existence of a triable issue of material fact as to causation. (*Ibid.*) Because the plaintiff in *Hunter* failed to produce such evidence, and made only an insufficient showing that PMC was "potentially present" at plaintiff's work site, he did not create a genuine factual dispute, and summary judgment was proper. (*Id.* at pp. 1289-1290.)

■ We are presented with a situation similar to *Hunter*.[12] In support of its summary judgment motion, Wilbur-Ellis relied upon Albert Chaknova's

---

[12]Appellants' reliance on *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733 [41 Cal.Rptr.2d 719] is misplaced. There, the defendant's reliance on the plaintiff's factually devoid discovery responses was inadequate to shift the burden of proof on summary judgment, because the plaintiff could not have been expected to have knowledge of the defendant's allegedly conspiratorial conversations, a matter particularly within the defendant's own knowledge. For the same reason, *Hagen* v. *Hickenbottom* (1995) 41 Cal.App.4th 168 [48 Cal.Rptr.2d 197] is of no help to appellants. In that case, factually devoid discovery responses did not shift the

deposition testimony that he had never heard of L. H. Butcher and did not recall using Fibreboard or Pabco products during his career.[13] It further relied on his interrogatory responses which did not, in response to contention interrogatories, include any reference to L. H. Butcher as one of the dozens of entities he contended had "manufactured, supplied, distributed, installed and/or contracted for" the asbestos-containing products to which he was exposed, which failed, in any respect, to mention L. H. Butcher, and which identified no asbestos products by specific brand name to which he was exposed during the years 1960 to 1964. Pointing to these allegedly factually devoid discovery responses, Wilbur-Ellis asserted that Albert Chaknova could not show a connection between his injury and Wilbur-Ellis/L. H. Butcher products.

In response, the Chaknovas did not materially dispute Wilbur-Ellis's assertions, but claimed that Wilbur-Ellis had failed to meet its burden of proof, so that they were under no duty to respond with any additional

---

burden of proof on summary judgment to the plaintiffs because they could not have had personal knowledge of alleged undue influence exerted by the defendant over the decedent. By contrast, here, Albert Chaknova does have personal knowledge of his working environments since the 1940's, and provided no evidence to implicate respondent in his asbestos exposure. Finally, the similarity to *Hunter* distinguishes this case from Division Two's recent opinion in *Scheiding* v. *Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64 [81 Cal.Rptr.2d 360]. In *Scheiding* defendant Dinwiddie sought summary judgment based "upon the declaration of defense counsel that '[p]laintiff did not testify that he worked at any jobsite at which Dinwiddie was the general contractor.' " (*Id.* at p. 80.) The court refused to extend *Hunter* to the case before it because no party had ever directly asked the plaintiff whether Dinwiddie had been the general contractor at any jobsite where the plaintiff had worked; in fact, no one ever asked the plaintiff *anything* about Dinwiddie. (*Ibid.*) On this basis, the *Scheiding* court distinguished *Hunter*, because in *Hunter* (as here) there was deposition testimony "where the plaintiff was *specifically asked* about the defendant and said he 'could not recall' . . . . [Citation.]" (*Ibid.*, italics in original.) These questions and their answers were sufficient to support a showing of "factually devoid" discovery responses. Without such specifically asked questions, however, the *Scheiding* court concluded it would be unreasonable to infer that plaintiff could produce no evidence linking Dinwiddie to plaintiff's illness. Because the facts in the case before us parallel those in *Hunter*, we follow that case.

[13]The following exchange took place during Albert Chaknova's deposition: "Q. Mr. Chaknova, have you ever heard of a company called L. H. Butcher? [¶] A. No, I don't believe so. [¶] Q. Have you ever heard of a company called Pabco? [¶] A. Yes. [¶] Q. Where have you heard of the company Pabco? [¶] A. For some reason I think I've seen trucks of theirs. [¶] Q. Where have you seen trucks of theirs? [¶] A. Around the city. [¶] Q. Just driving around? [¶] A. Driving around. [¶] Q. Do you associate any job sites where you might have seen— [¶] A. I don't know if I saw them on any job sites. I don't recall. . . . [¶] Q. Do you know what products might be associated with Pabco? [¶] A. I wouldn't have any idea. [¶] Q. Have you ever heard of a company Fibreboard? [¶] A. Fibreboard, who hasn't. [¶] Q. What products have you— [¶] A. They used to make a lot of stuff. [¶] Q. Do you know offhand what sort of things? [¶] A. They made sheetrock, I think, I'm almost sure they did. [¶] Q. Anything else? [¶] A. They might have made other products which I can't remember. [¶] Q. Do you remember during any of your work experience whether you used Fibreboard products? [¶] A. I don't remember that."

evidence. They did, nonetheless, refer to Wilbur-Ellis's discovery responses which showed that L. H. Butcher sold raw asbestos fibers used in Fibreboard, Pabco and Eagle-Picher products and to Albert Chaknova's responses to special interrogatories in which he contended, generally (and contrary to his specific deposition testimony), to have been exposed to these products at jobsites identified in earlier interrogatories.[14] The responses also conceded that the Chaknovas were not contending exposure to L. H. Butcher/Wilbur-Ellis asbestos containing materials after 1960.

Appellants contend that these general discovery responses are sufficient to create a triable issue of material fact regarding Albert Chaknova's exposure to L. H. Butcher/Wilbur-Ellis products. They claim that a trier of fact could infer such exposure from evidence that Fibreboard and Pabco products, which might have contained asbestos brokered by L. H. Butcher, might have been present at jobsites where Albert Chaknova worked.

We hold that the evidence is neither actually nor hypothetically susceptible to such an inference. First, while the Chaknovas' discovery responses indicate generally that Fibreboard and Pabco products might have been present at some jobsites, Albert Chaknova's deposition testimony is more specific in stating that he has no such knowledge or recollection.[15] Second, under *Hunter*, the evidence presented by appellants is insufficient, as it "offers only speculation and conjecture" regarding exposure to asbestos-containing products brokered by L. H. Butcher/Wilbur-Ellis. As was the case in *Hunter*, after ample time to undertake discovery, appellants have "provided no evidence with respect to the time, location and actual circumstances" of Albert Chaknova's exposure to asbestos products in any manner

---

[14]In their interrogatory response the Chaknovas stated: "Plaintiffs are currently unable to be specific regarding each and every transaction of asbestos sold, distributed, or otherwise supplied by L. H. Butcher\WILBUR-ELLIS COMPANY prior to 1960 and subsequent to March 2, 1964. However, plaintiffs currently contend that plaintiff ALBERT CHAKNOVA was exposed to asbestos sold, distributed, or otherwise supplied by L. H. Butcher\WILBUR-ELLIS COMPANY to plaintiff's employers and jobsites identified in his responses to Standard Asbestos Case Interrogatories. Plaintiffs currently contend that ALBERT CHAKNOVA was either exposed to asbestos fibers sold, supplied, brokered or distributed by defendant, or in the alternative, asbestos-containing materials with asbestos fibers sold, supplied, brokered or distributed by defendant at said jobsites. Plaintiffs currently contend ALBERT CHAKNOVA breathed said respirable asbestos fibers and was injured as a result thereof. *Plaintiffs are currently unable to be more specific at this time, except to generally identify Fibreboard, Pabco, and possibly Eagle products at these jobsites.* Plaintiffs' investigation and discovery are continuing." (Italics added.)

[15]Appellants contend that we should not undertake to resolve credibility questions on summary judgment. The issue is not one of credibility, but of clarity. The Chaknovas addressed the subject matter generally in their interrogatory responses, and specifically in deposition. The specific responses show that appellants lack the specific factual basis to support their claim.

related to respondents. (*Hunter, supra*, 37 Cal.App.4th at p. 1290.) By reference to appellants' factually devoid discovery responses, respondent showed that appellants could not establish at least one element of their cause of action. Appellants failed to present evidence in response sufficient to create a triable issue of material fact regarding Albert Chaknova's exposure to asbestos-containing products related to respondent. Summary judgment was properly entered in favor of Wilbur-Ellis.

## DISPOSITION

Wilbur-Ellis cannot be held liable for the Chaknovas' injuries either under ordinary rules of corporate successor liability, or under the special rule enunciated in *Ray* v. *Alad*. The agreement for Wilbur-Ellis's purchase of L. H. Butcher's asbestos business neither expressly nor impliedly provided that Wilbur-Ellis would assume liability for future tort liability claims arising out of exposure to asbestos before Wilbur-Ellis acquired the business. Nor did any corporate merger effectuate the adoption of such liability. Wilbur-Ellis is also not liable to appellants as a product line successor because the facts as presented on summary judgment do not satisfy the criteria established in *Ray* v. *Alad*. Finally, appellants failed to create a triable issue of material fact as to Albert Chaknova's exposure to asbestos brokered or distributed by L. H. Butcher prior to or during the years 1960 to 1964. The granting of summary judgment in favor of Wilbur-Ellis is affirmed. Respondent to recover costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred

Appellants' petition for review by the Supreme Court was denied April 21, 1999. Mosk, J., was of the opinion that the petition should be granted.